## DARYL BLYDEN, Appellant/Defendant
## v.
## PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff

S. Ct. Crim. No. 2007-0105

Supreme Court of the Virgin Islands

July 7, 2010

639

NATALIE NELSON TANG HOW, ESQ., St. Croix, USVI, *Attorney for Appellant*.

TERRYLN M. SMOCK, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; STEELE, *Designated Justice*; and HODGE, *Designated Justice*.[1]

## OPINION OF THE COURT

(July 7, 2010)

HODGE, C.J. Appellant, Daryl Blyden ("Blyden"), appeals from the Superior Court's September 25, 2007 Judgment which sentenced him to incarceration for life without parole plus forty-five additional years. For the reasons which follow, we will reverse Blyden's conviction as to the unauthorized possession of ammunition count but will affirm his conviction as to all other counts.

---

[1] Associate Justices Maria M. Cabret and Ive Arlington Swan are recused from this matter. Verne A. Hodge, a retired Presiding Judge of the Superior Court, and the Honorable Patricia D. Steele, a sitting Judge of the Superior Court, respectively, have been designated in their place pursuant to title 4, section 24(a) of the Virgin Islands Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 7:30 p.m. on September 24, 2005, Virgin Islands police officers were dispatched to the scene of a shooting in the Savan neighborhood of St. Thomas. At the scene, officers discovered the body of an individual, later identified as Kevin Walker ("Walker"), who exhibited no signs of life. Police subsequently discovered that another individual, Iba Matthews ("Matthews"), had been wounded in the same shooting incident and had ridden his bicycle to his car and then driven himself to the hospital. The police investigation revealed that Matthews had been shot in the back and had not seen the person who shot him or Walker.

Shortly after the shooting, the police department's central dispatch transmitted an eyewitness's description of the suspect as a black male wearing a blue shirt and jeans and riding a bicycle. At the time of the transmission, two detectives, who were driving in the vicinity of the shooting, observed a black male wearing a blue shirt and jeans walking from the "gut" area at a fast pace and noticeably sweating. The detectives — Joel Dowdye ("Dowdye") and Sophia Rashid ("Detective Rashid") — immediately exited their unmarked police vehicle, drew their guns, identified themselves as police, and ordered the individual down on the ground. The individual, subsequently identified as Blyden, got down on the ground and was placed in handcuffs. While Detective Rashid went into the vehicle to transmit that they had a suspect, Dowdye patted Blyden down and recovered a firearm, money, marijuana, and a black tam. Detective Rashid testified at trial that she did not see Dowdye remove the items from Blyden but she heard him say "gun" and saw him place the gun and other items on the hood of the car.

Thereafter, Blyden was transported to the Criminal Investigation Division of the police station, where his photograph was taken. Detective Margaret Price ("Detective Price"), who was off-duty but present at the station, testified at trial that Blyden:

> was handcuffed to a chair, and while he was sitting in the chair he made several statements. He stated that he passed in the area . . . the guy looked at him in his face. Then he proceeded to say he doubled back, and he put the shot in the guy the same way the guy put the shots in his brother, and if it takes 20 years he's going to get the other two.

(Trial Tr. vol. IV, 269, July 10, 2007.) Detective Price further testified that Dowdye was also present when Blyden made these statements. (*Id.* at 270.)

On cross-examination, the detective stated that she did not know whether Blyden had been advised of his rights at that time or whether Dowdye may have asked Blyden a question earlier that had prompted Blyden's statements.

The People of the Virgin Islands ("the People") filed an Amended Information which charged Blyden with first degree murder pursuant to V.I. CODE ANN. tit. 14 § 922(a)(1), two counts of assault in the first degree pursuant to 14 V.I.C. § 295(1), multiple counts of possession of an unlicensed firearm pursuant to 14 V.I.C. § 2253(a), one count of possession or sale of ammunition pursuant to 14 V.I.C. § 2256, and one count of buying, receiving, or possessing stolen property pursuant to 14 V.I.C. § 2101(a). On April 19, 2007, Blyden filed his Motion to Suppress Physical Evidence, arguing that all of the evidence seized from his person had been obtained pursuant to an illegal arrest. Blyden's accompanying Memorandum of Law in Support of Motion to Suppress Physical Evidence sought suppression of the seized items as well as his inculpatory statements. The trial court held a suppression hearing on May 3, 2007. Concluding from Dowdye[2] and Detective Rashid's testimonies that there was reasonable suspicion to stop and search Blyden and that Blyden's inculpatory statements were made voluntarily and not as a result of custodial interrogation, the trial court denied the motion to suppress on May 14, 2007.

Blyden's trial began on June 25, 2007. Near the conclusion of its case-in-chief, the People called Dowdye as a witness. Having been convicted of first degree murder and attempted first degree murder in an unrelated homicide, Dowdye was no longer a detective and was serving a sentence of life imprisonment without parole plus forty years. Dowdye refused to testify at trial regarding his arrest of Blyden, stating "I don't have nothing to say to nobody . . . ." (Trial Tr. vol. III, 40, June 28, 2007.) Dowdye stated that he would not testify because the community and the people he had worked with as a detective had turned their backs on him. The trial judge asked Dowdye whether an order holding him in contempt would change his mind about testifying, and Dowdye replied that it would

---

[2] Because Blyden called Dowdye as his witness at the suppression hearing, Dowdye was questioned by Blyden on direct and re-direct examination, and the People questioned Dowdye on cross-examination.

not.[3] After concluding that Dowdye could not be compelled to testify, the court granted the People's request to have Dowdye declared unavailable and permitted the People to read into the trial record Dowdye's full testimony from the May 3, 2007 pre-trial suppression hearing.

After the People rested its case, Blyden moved for a judgment of acquittal as to all counts. Because the trial court found that the People had not proven the possession of stolen property count, the trial court dismissed that count but denied Blyden's motion as to the other counts. During the defense's case-in-chief, Blyden took the stand and testified, *inter alia*, that he was not carrying a firearm when he was arrested, that Dowdye questioned him at the police station without reading him his *Miranda* rights, and that he did not respond to Dowdye's questions. At the conclusion of his case, Blyden renewed his motion for a judgment of acquittal as to the remaining eight counts, which was again denied by the trial court.

On July 11, 2007, the jury returned its verdict finding Blyden guilty of each of the remaining eight counts. On August 31, 2007, the trial court orally sentenced Blyden to life imprisonment without parole plus forty-five years and ordered him to pay a large fine. Blyden filed a timely notice of appeal on September 6, 2007, and the Superior Court memorialized its oral sentence in a September 25, 2007 Judgment.[4]

## II. DISCUSSION

### A. Jurisdiction and Standards of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees [and] final orders of the Superior Court." 4 V.I.C. § 32(a) (Supp. 2008). Our review of the Superior Court's application of law is plenary, while findings of fact are reviewed only for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). "In reviewing the trial court's decision on [a] motion to suppress, 'we review its factual findings for clear error and exercise

---

[3] The judge also confirmed that Dowdye did not own any property that might be used to induce his testimony.

[4] "A notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment." V.I.S.CT.R. 5(b)(1).

plenary review over its legal determinations.' " *People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)) (internal quotations omitted). Moreover, "[t]he standard of review for challenges under the Sixth Amendment's Confrontation Clause is plenary." *Latalladi v. People*, 51 V.I. 137, 141 (V.I. 2009). Finally, our review of the trial court's admission of evidence is only for abuse of discretion. *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008).

## B. The Trial Court Did Not Err in Denying Blyden's Motion to Suppress

As his first ground for appeal, Blyden argues that the trial court erred in denying his motion to suppress all evidence seized from his person, including the unlicensed firearm, and all inculpatory statements because the evidence was obtained pursuant to an illegal arrest without probable cause in violation of the Fourth Amendment. The People counter that the police had reasonable suspicion to stop Blyden and frisk him for weapons. In denying Blyden's motion to suppress, the trial court held that it was reasonable for the officers to stop Blyden and search him under the totality of the circumstances, particularly because Blyden matched the description of the suspect and was sweating and walking quickly in the area immediately after the shooting. (Hr'g Tr., 77-78, May 2, 3007.)

██ The Fourth Amendment[5] "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) (internal quotations omitted). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person, and the Fourth Amendment requires that the seizure be 'reasonable.' " *Id.* (alteration in original) (internal quotations omitted). Importantly, the Supreme Court of the United States has distinguished between arrests and investigative stops. The Court has explained that "in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause

---

[5] The Fourth Amendment of the United States Constitution is applicable in the Virgin Islands pursuant to § 3 of the Revised Organic Act of 1954, as amended, 48 U.S.C. § 1561. The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645, reprinted in V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

to arrest or to search for contraband or evidence of crime." *United States v. Brignoni-Ponce*, 422 U.S. 873, 882, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975). In particular, in the seminal case of *Terry v. Ohio*, the Court held that a police officer may stop a suspect on the street and conduct a limited search, i.e. a frisk, of the suspect without probable cause:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety.

392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

■■■ First, we address Blyden's contention that he was arrested at the time the detectives stopped him because he was handcuffed and was not free to go. It is well established that during an investigative stop, police officers may take measures "reasonably necessary to protect themselves and maintain the status quo." *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). Consequently, "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Baker v. Monroe Tp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (collecting cases). *See, e.g., United States v. Goode*, 309 Fed. Appx. 651, 653 (3d Cir. 2009) (unpublished) (use of guns and handcuffs did not transform investigate stop to illegal arrest when defendant "was suspected of dealing drugs, a crime with which weapons and violence are frequently associated" (internal quotations omitted)); *United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir. 1996) (placing handcuffs on suspect does not transform detention into unlawful arrest so long as officers have reasonable suspicion that suspect is the wanted felon). Accordingly, the fact that the police immediately drew their weapons, ordered Blyden to the ground, and handcuffed him did not transform his detention into an illegal arrest if the officers had reasonable suspicion "that criminal activity [was] afoot and that the persons with whom [they were] dealing [was] armed and presently dangerous." *Terry*, 392 U.S. at 27, 30 ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual,

regardless of whether he has probable cause to arrest the individual for a crime."). *See also Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1904, 20 L. Ed. 2d 917 (1968) ("If [the policeman] lacked probable cause for an arrest, however, his seizure and search of [defendant] might still have been justified at the outset if he had reasonable grounds to believe that [defendant] was armed and dangerous.").

Although "[r]easonable suspicion is an 'elusive concept' . . . it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)).

> The Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences, personal observation of suspicious behavior, information from sources that have proven to be reliable, and information from sources that — while unknown to the police — prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip.

*United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002) (citations omitted) (collecting cases). In this case, a witness, whose identity was known to the police,[6] described the suspect as a black male wearing a blue shirt and jeans and riding a bicycle. Arriving in the vicinity of the shooting five minutes later, the officers personally observed Blyden wearing clothing that matched the witness's description, emerging from the gut, and walking from the area of the shooting at a fast pace while visibly sweating. Under these circumstances, we conclude that the police had reasonable grounds to believe that Blyden was the person who had committed the crime involving gunfire, which had resulted in a fatality, and that he was likely armed and dangerous. *See, e.g., United States v. Harple*, 202 F.3d 194, 196-97 (3d Cir. 1999) (hold-

---

[6] Although Blyden argues in his appellate brief that the witness was anonymous, the record indicates that the identities of all witnesses were known to the People. In fact, the transcript from jury selection reveals that Blyden was provided with the names and addresses of all witnesses who had made statements after he raised concerns about certain redacted statements. (Trial Tr. vol. I, 22-24, 67-68, June 25, 2007.)

ing that, when other factors, such as the suspect's geographic proximity to the crime scene, are present, the fact that a suspect matches a witness description may give rise to reasonable suspicion). Thus, the Fourth Amendment permitted the officers to stop Blyden and conduct a limited search of his person in order to determine whether he was carrying a weapon. As a result, the officers' actions in handcuffing and ordering Blyden to the ground did not transform the initial stop into an arrest requiring probable cause, and, because the firearm recovered during the *Terry* stop was not excludable as the fruit of an illegal arrest, the trial court properly denied Blyden's motion to suppress the firearm. *See Wong v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (holding that evidence derived from a Fourth Amendment violation must be excluded from trial as "fruit of the poisonous tree").

In addition to seeking suppression of the firearm, Blyden's motion to suppress sought suppression of all other physical evidence seized from his person as well as his subsequent inculpatory statements made at the police station. In support thereof, Blyden similarly argued that the physical evidence and statements were obtained as a result of an illegal arrest. At trial, Detective Rashid testified that Dowdye had patted Blyden down and recovered a firearm. (Trial Tr. vol. II, 111, June 27, 2007.) As we have held above, such a search and seizure under the circumstances of this case was clearly permissible under *Terry*. However, Detective Rashid's testimony reveals that Dowdye continued to search Blyden's person after recovering the firearm and recovered various other items, including marijuana and money. Following seizure of the additional physical evidence, the officers placed Blyden in their vehicle and transported him to the police station. While at the station awaiting transfer to the Major Crimes Unit, Blyden, who was handcuffed to a chair at the time, began making incriminating statements.

Importantly, "[t]he search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault [against the officer]." *Sibron*, 392 U.S. at 65. The continued search of Blyden's person and seizure of the additional physical evidence undoubtedly exceeded the scope of the search sanctioned by *Terry* because no reasonable officer would have believed that those items could be another weapon. *See, e.g., United States v. Campa*, 234 F.3d 733, 739 (1st Cir. 2000) ("Although we recognize that searching by means of a pat-down is

not an exact science, the government does not even argue that [the officer] thought appellant's wallet-the item particularly at issue here-could be a weapon. He simply removed every bulging object as he searched, undoubtedly a convenient method for detecting weapons, but one that goes beyond the limited invasion of privacy authorized by *Terry* and its progeny."). Therefore, some additional justification was required for the further intrusion upon Blyden's rights.

 After reviewing the record in this case, we conclude that the Fourth Amendment was not violated by Dowdye's seizure of the additional items because probable cause arose to arrest Blyden at the time Dowdye recovered the firearm during the lawful *Terry* stop. "Probable cause exists where facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been . . . committed by the person to be arrested." *United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990). As we have concluded above, it was reasonable for Dowdye to conclude that Blyden had just committed a crime involving gunfire in light of his presence in the vicinity of the crime very soon after the shooting as well as his overall physical appearance. With this knowledge, the recovery of a firearm from Blyden, a person suspected of having recently committed a shooting, ripened Dowdye's reasonable suspicion to stop and frisk Blyden into probable cause to arrest him as a suspect in the shooting.[7] *See, e.g., United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (discovery of wad of money during *Terry* stop provided probable cause for arrest of person suspected of committing bank robbery); *United States v. Wilson*, 2 F.3d 226, 232 (7th Cir. 1993) ("The [marijuana] baggies [found during the initial *Terry* stop] supplied the probable cause that indisputably converted the encounter into a full arrest. At this point, it is without question that the officer had probable cause to arrest Mr. Wilson."); *United States v. Thomas*, 74 Fed. Appx. 189, 191-92 (3d Cir. 2003) (unpublished) (probable cause to support arrest after officers recovered firearm, suspected to be unlicensed, during *Terry* stop because police had information that criminal activity was afoot).

---

[7] We note that the officers were not required to formally advise Blyden immediately after recovering the firearm that he was "under arrest" in order for the arrest to be properly effectuated. *See Dunaway v. New York*, 442 U.S. 200, 212-13, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979) (stating that defendant need not be told he is under arrest for arrest to be valid).

▇▇ As the Supreme Court expressly held in *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), "[t]here is ample justification [following an arrest] . . . for a search of [an] arrestee's person . . . ." Therefore, Dowdye was justified under the search incident to arrest doctrine in continuing to search Blyden after recovery of the firearm and in seizing the additional items found during the continued search.[8] As a consequence, it follows that Blyden's inculpatory statements made at the police station were not excludable as the fruit of an unlawful arrest. Finally, we note that the officers' actions in subsequently transporting Blyden to the police station, taking his photograph, and otherwise booking him were taken in accordance with the lawful arrest which had occurred after Dowdye's recovery of the firearm.

Accordingly, we conclude that Blyden's Fourth Amendment rights were not violated and that Blyden's motion to suppress all physical evidence and his inculpatory statements was properly denied.

### C. The Trial Court Did Not Err in Admitting Dowdye's Pre-Trial Testimony

As his second ground for appeal, Blyden contends that the trial court violated the Sixth Amendment's Confrontation Clause by permitting the People to read Dowdye's suppression hearing testimony into the record at trial. In support, Blyden argues that he did not have an adequate opportunity to confront Dowdye at the pre-trial suppression hearing because Blyden conducted only a limited direct examination of Dowdye. The People counter that Blyden's direct examination of Dowdye satisfies the right to confront adverse witnesses guaranteed by the Sixth Amendment. At trial, the court admitted Dowdye's prior testimony, finding that Dowdye was unavailable and that Blyden had an opportunity and similar motive at the suppression hearing to develop Dowdye's testimony.

▇▇ The plain text of "[t]he Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the

---

[8] Blyden was not charged in the Amended Information with, or ultimately convicted of, any offense involving the marijuana or other seized items.

right . . . to be confronted with the witnesses against him.' "[9] *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (quoting U.S. CONST. amend. VI). As the United States Supreme Court recognized in *Crawford*, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," and thus "[t]he Sixth Amendment must be interpreted with this focus in mind." *Id.* at 50. Accordingly, the *Crawford* court held that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, *and only where the defendant has had a prior opportunity to cross-examine.*" *Id.* at 59 (emphasis added).

 In this case, the parties do not dispute the trial court's decision to declare Dowdye unavailable.[10] Instead, the parties dispute whether Blyden had a prior opportunity to cross-examine Dowdye. During the May 3, 2007 hearing on Blyden's motion to suppress, Blyden called Dowdye as a witness and questioned him on direct and re-direct examination rather than cross-examination. Contrary to Blyden's contention, however, "[t]he opportunity to cross-examin[e] is not construed literally; rather the party must have the opportunity to develop the testimony through questioning." 2 Kenneth S. Broun, MCCORMICK ON EVIDENCE § 302 (6th ed.). In *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), the United States Supreme Court was similarly faced with the admission of pre-trial suppression hearing testimony at trial. The defendant in *Roberts*, like Blyden, challenged the admission of the prior testimony on grounds that he had questioned the witness on direct examination rather than cross-examination. *See* 448 U.S. at 70. The *Roberts* Court concluded that the defendant's

---

[9] The Sixth Amendment to the United States Constitution is applicable in the Virgin Islands pursuant to § 3 of the Revised Organic Act of 1954, as amended, 48 U.S.C. § 1561.

[10] We note that courts have deemed a witness unavailable when a witness is already incarcerated and it is clear that the threat of contempt would be futile. *See, e.g., Gregory v. Sheldon County*, 220 F.3d 433, 449 (6th Cir. 2000) ("Any pressure upon the witness, or any pressure of threat applied to the witness by the trial court would undoubtedly have been unavailing as the witness is already serving a life sentence."); *Rychart v. State*, 778 P.2d 229, 231 (Alaska Ct. App. 1989) ("In a case where the declarant is already incarcerated, it is not unreasonable for the trial judge to conclude that contempt proceedings would not motivate a witness to testify.").

questioning of the witness "afforded 'substantial compliance with the purposes behind the confrontation requirement' no less so than classic cross-examination."[11] *Id.* (quoting *California v. Green*, 399 U.S. 149, 166, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)). Specifically, the Court held that, although the defendant did not technically cross-examine the witness, the defendant partook of cross-examination as a matter of form, because his direct examination was replete with leading questions and because the defendant's questioning of the witness comported with the main purpose of cross-examination — i.e. to challenge the veracity of the witness's testimony and to determine whether the witness accurately perceived the matter testified to and whether the witness's statements convey their intended meaning. *See id.*

 In this case, although he did not technically cross-examine Dowdye, we consider whether Blyden nevertheless partook of cross-examination as a matter of form. First, as in *Roberts*, a review of the suppression hearing testimony reveals numerous leading questions by defense counsel on direct and re-direct examination.[12] Indeed, the record

---

[11] Blyden argues that *Crawford* overruled *Roberts's* acceptance of such prior testimony. However, as the People correctly argue, Blyden misconstrues *Crawford's* impact on *Roberts*. *Crawford* abrogated *Roberts* only with respect to *Roberts's* rationale that former testimony is admissible where there are adequate indicia of reliability. *See Crawford*, 541 U.S. at 68-69. It is clear from a reading of *Crawford* that the United States Supreme Court in fact approved of the ultimate holding in *Roberts*. *See id.* at 58 ("Even our recent cases, in their outcomes, hew closely to the traditional line. [*Roberts*] admitted testimony from a preliminary hearing at which the defendant had examined the witness."), and 60 ("Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales." (citing *Roberts*)). *Accord Commonwealth v. Wholaver*, 989 A.2d 883, 903 (Pa. 2010) ("Thus, although the reliability of a prior statement is no longer an inquiry for purposes of satisfying the Confrontation Clause, the Court's rationale [in *Roberts*] that the preliminary hearing questioning served the function of cross-examination remains persuasive for purposes of evaluating whether *Crawford's* cross-examination requirement has been met.").

[12] The following colloquies represent a few of the instances in which Blyden's counsel undertook leading questioning of Dowdye at the suppression hearing:

Q: Did you have any conversation with that individual before you placed handcuffs on him?
A: Only my partner. She ordered him down on the ground, and he complied.
Q: And that was not a conversation that was an order, correct?
. . . .
Q: So the individual that you detained could not leave?
A: No.

▓▓▓▓▓▓▓▓▓▓▓

indicates that counsel for the People objected to the leading nature of Blyden's questions on at least one occasion. (Hr'g Tr., 53.) As to whether Blyden's examination of Dowdye comported with the main purposes of cross-examination, we note that Blyden's counsel was not required to question Dowdye rigorously regarding his veracity or credibility because Dowdye's suppression hearing testimony was largely favorable to Blyden. The suppression hearing transcript demonstrates that Blyden's counsel extensively questioned Dowdye concerning the manner of the arrest and whether Blyden had been read his rights prior to making certain inculpatory statements to the police. The transcript also illustrates that the majority of Dowdye's responses clearly benefited Blyden's motion to suppress. The following colloquy is illustrative:

> Q: Did you have any conversation with that individual before you placed handcuffs on him?
>
> A: Only my partner. She ordered him down on the ground, and he complied.
>
> Q: And that was not a conversation that was an order, correct?
>
> A: Yes.
>
> Q: And were — when he was ordered down on the ground were guns drawn at that time?
>
> A: Yes.
>
> Q: So the individual that you detained could not leave?
>
> A: No.
>
> Q: After the individual was placed in handcuff was he read his rights?

(Hr'g Tr., 51-52, May 3, 2007.)

> Q: When you went upstairs with Mr. Blyden at that time did you give him any documents to sign for his advice of rights?
>
> A: No, I didn't.
>
> Q: Don't you believe that would have been prudent, sir?
>
> . . . .
>
> Q: Isn't it normal procedure when you advise someone of their rights for them to sign knowing that they have been advised of their rights?
>
> A: Yes.
>
> Q: So you did not follow normal procedure with Mr. Blyden to ensure that he signs saying that you read him his rights?
>
> A: No, I did not.

(Hr'g Tr. 56.)

A: Not at that time.

. . . .

Q: Was a document — is there a document that you signed and the individual signed evidencing that you read him his rights?
A: No.

(Hr'g Tr. 51-53.) More importantly, there is no indication in the hearing transcript of any ruling by the trial judge which improperly limited or hindered Blyden's examination of Dowdye. *See Chavez v. State*, 213 P.3d 476, 485-86 (Nev. 2009) ("[T]he magistrate judge allowed [defendant] unrestricted opportunity to confront [the witness] on all pertinent issues . . . ."). Consequently, we do not find any error in the trial court's admission of Dowdye's prior testimony at trial.

 Moreover, even if we were to conclude, which we do not, that the trial court erred in admitting Dowdye's pre-trial testimony, reversal is not required if such error was nevertheless harmless. *See, e.g., United States v. Jimenez*, 513 F.3d 62, 78 (3d Cir. 2008) ("The erroneous admission of testimonial hearsay in violation of the Confrontation Clause is simply an error in the trial process itself . . . [that] we may affirm if the error was harmless." (internal quotations omitted) (alterations in original)). In determining whether an error in admitting testimony is harmless, several factors are considered including: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."[13] *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *see also Jimenez*, 513 F.3d at 78.

 In his prior testimony, Dowdye testified concerning his stop of Blyden and seizure of a firearm and other items, his failure to have Blyden sign a waiver after reading him his rights, inculpatory statements made by

---

[13] We note that neither party addressed the harmless error doctrine in their briefs. However, at oral argument, counsel for the People argued that other police officers testified at trial to facts similar to those testified to by Dowdye at the suppression hearing. Furthermore, an appellate court may apply the harmless error doctrine *sua sponte*. *See, e.g., United States v. Faulks*, 201 F.3d 208, 213 (3d Cir. 2000).

Blyden at the station, and the fact that he had asked Blyden about a different shooting sometime prior to Blyden making the inculpatory statements. Our review of the trial testimony leads us to conclude that, most, if not all, of Dowdye's prior testimony was cumulative. *See, e.g., Bertrand v. State*, 363 Ark. 422, 214 S.W.3d 822, 826 (2005) ("[I]t is clear to this court [the witness's] testimony in placing [defendant] at the crime scene was cumulative. . . . Hence, even had it been error to read [the] prior testimony to the jury, the error was harmless."); *People v. Horton*, 65 Ill. 2d 413, 358 N.E.2d 1121, 1124, 3 Ill. Dec. 436 (1976) ("We have examined the transcript of [the witness's] testimony and find nothing therein which was not covered by testimony of other witnesses." (considering confrontation issue)). Specifically, the inculpatory statements allegedly made by Blyden were testified to at trial by Detective Delbert Phipps and Detective Price. Additionally, numerous witnesses indicated on cross-examination by defense counsel that Blyden may not have been read his rights prior to making at least one of the inculpatory statements. Moreover, the jury was presented with expert testimony that Blyden had tested positive for gunshot residue and that the firearm allegedly seized from Blyden matched the bullets and casings recovered from the victims and the crime scene. Thus, clearly there was ample other evidence, including testimonial and physical evidence, corroborating Dowdye's pretrial testimony. Furthermore, it does not appear that Dowdye's testimony was particularly important to the People's case.[14]

Accordingly, this Court holds that the trial court did not err in admitting Dowdye's prior testimony, and that, even if such admission was in error, it was nevertheless harmless.

### D. Admission of the Firearm Was Not an Abuse of Discretion

As his third ground for appeal, Blyden maintains that, pursuant to Federal Rule of Evidence 901(a), the firearm should not have been

---

[14] We note that Blyden argues in his brief that the admission of Dowdye's prior testimony prevented him from impeaching Dowdye's credibility with his felony conviction. However, a jury had already convicted Dowdye on March 4, 2007, two months prior to the May 3, 2007 suppression hearing. Although Dowdye's Judgment and Commitment was not entered until May 9, 2007, he was orally sentenced on April 4, 2007. Nevertheless, Blyden chose not to question Dowdye at the suppression hearing concerning his recent conviction. Nor did Blyden attempt to introduce the record of Dowdye's conviction at trial or request that the trial judge take judicial notice of Dowdye's conviction.

admitted into evidence because no witness testified that the firearm removed from Blyden was the same firearm offered at trial. The People counter that the trial court did not abuse its discretion in admitting the firearm because a chain of custody was properly established. Specifically, the People presented testimony establishing that Dowdye gave the firearm to Forensic Investigator Daphne Rouse-Carty ("Rouse-Carty") which she promptly marked with her initials, that Rouse-Carty sent the firearm, the bullets recovered from Walker's body and multiple spent casings from the crime scene to the Federal Bureau of Investigation ("FBI") for testing, and that the firearm, bullets and casings were otherwise securely locked in her office prior to trial. Additionally, an expert witness — a firearms and toolmarks examiner from the FBI — testified that he had returned the firearm admitted at trial to Rouse-Carty after testing it and determining that it functioned properly and that it positively matched numerous bullets and spent casings recovered from the crime scene. (Trial Tr. vol. II, 191-98.)

 As we have repeatedly stated, the 1953 version of the Uniform Rules of Evidence ("URE"), codified as 5 V.I.C. §§ 771-956, apply to evidentiary issues in local Virgin Islands courts.[15] *See, e.g., Phillips v. People*, 51 V.I. 258, 273 (V.I. 2009). Although the Federal Rules of Evidence ("FRE") require the authentication of writings and non-writings, the 1953 version of the URE provide only for the authentication of writings. Specifically, FRE 901(a) has a general requirement of authentication of any piece of evidence — whether a writing or non-writing. *See, e.g., Elkin v. Fauver*, 969 F.2d 48, 51-52 (3d Cir. 1992) (analyzing whether chain of custody evidence was sufficient for admission of physical evidence under FRE 901). In addition, FRE 902, 903, and 1001-1007 govern the authentication of writings, recordings, and photographs. In contrast, the local rules of evidence governing

---

[15] We note that on March 26, 2010 the Legislature approved, and on April 7, 2010 the Governor signed into law, Act No. 7161, section 15 which repealed the local URE. However, because Blyden's trial concluded before the URE was repealed, this Court applies on appeal the evidentiary rules that were in effect at the time Blyden was tried in the Superior Court. *See, e.g., Black v. M&W Gear Co.*, 269 F.3d 1220, 1228 n.3 (10th Cir. 2001) (declining to apply amended rules of evidence on appeal when prior rules had been in effect during trial); *State v. Meyers*, 153 Ore. App. 551, 958 P.2d 187, 191 (1998) (explaining that applying amended rules of evidence to appeals of trial court orders decided when prior rules were in effect constitutes "a moving of the proverbial goal posts after the contest is over" that "raises serious questions of due process.").

authentication are found in 5 V.I.C. §§ 951-956 and govern only writings.[16]

However, 5 V.I.C. § 778 provides that a party may "introduce before the jury evidence relevant to weight and credibility." As noted above, the People presented testimony establishing the manner in which the police collected, marked, and maintained the firearm prior to trial. Thus, even though the local rules of evidence did not require authentication of the firearm prior to its admission, the People nevertheless presented ample evidence concerning the weight the jury should give to the firearm offered into evidence, including expert testimony that the firearm admitted at trial matched bullets and casings recovered from the crime scene and the bodies of the shooting victims. Additionally, section 778 also permitted Blyden to introduce evidence to the jury tending to show that the People had failed to adequately prove that the firearm admitted into evidence was the firearm Dowdye seized from him. In this case, the transcript reveals that Blyden's counsel amply expressed to the jury that the People had failed to connect the firearm to Blyden. In her closing argument, counsel stated:

> Detective Dowdye took up Mr. Blyden. Detective Rashid went around; she heard "gun." She did not see where the gun was retrieved. She did not see what type of gun was retrieved. . . . And she did not see Dowdye retrieve the weapon. Crucial. She did not see it.

(Trial Tr. vol. IV, 153.) Defense counsel again pointed out the purportedly tenuous connection to the firearm when she commented on the property receipt Blyden had signed: "I think the Government's hoping this form signed by Mr. Blyden is proof that the weapon is his. . . . It is not proof that it is his." (*Id.* at 158-59.) Additionally, defense counsel avidly maintained that the People had failed to connect the firearm to Blyden through Dowdye's testimony:

> The weapon that the Government has been publishing to you and showing to you was here on island and available, but never shown to Detective Dowdye. But the Government wants to make a leap from the

---

[16] We observe that the URE were heavily amended in 1974 and 1986 to bring the rules into near conformity with the FRE. Currently, URE 901(a), like FRE 901(a), has a general requirement of authentication of any piece of evidence.

alleged weapon that was taken by Mr. Dowdye to say that is that weapon, when they had the opportunity to present it to the only person that knows what weapon was recovered, if a weapon was recovered. They choose not to do that. Why? Because they didn't want to call Detective Dowdye, because he is tainted. . . . His testimony was, I recovered a weapon but to be honest with you I can't remember whether it was a revolver or what. . . . They had an opportunity to confirm that weapon. We don't know where it came from. We don't know if that's the weapon because Detective Dowdye did not identify it . . . .

(*Id.* at 161-62.) Most importantly, on cross-examination of Rouse-Carty — upon whose testimony the firearm was admitted into evidence — Blyden's counsel elicited testimony showing that there was no confirmation that the weapon given to the witness and placed in the police evidence locker was actually the firearm recovered from Blyden.[17] Despite defense counsel's cross-examination of Rouse-Carty and her fervent arguments concerning the weight the jury should give to the firearm, the jury clearly chose to believe the People's evidence concerning the authenticity of the firearm and convicted Blyden of all counts related to the firearm.

 Accordingly, because the local rules of evidence do not require specific authentication of non-writings and because both the People and Blyden made full use of the procedure suggested in 5 V.I.C. § 778, we hold that the trial court did not abuse its discretion in admitting the firearm into evidence.

---

[17] The following colloquy took place:

Q: You indicated that you received Exhibit Number 2 from Detective Dowdye. You do not know where Detective Dowdye received that firearm from; isn't that correct?
A: Correct.
Q: And you were not present when Detective Dowdye retrieved that firearm?
A: No, I was not.
Q: And you have no knowledge, no direct knowledge, as to where that firearm came from?
A: No.

(Trial Tr. vol. IV, 64.)

## E. Admission of Blyden's Inculpatory Statements Did Not Violate the Fifth Amendment

■ As his final ground for appeal, Blyden argues that the trial court improperly admitted several inculpatory statements he had made after being transported to the police station. Blyden maintains that Dowdye did not read him his rights after taking him into custody and that he did not knowingly and voluntarily waive his Fifth Amendment rights.[18] The People counter that any statements Blyden made while in police custody were admissible spontaneous utterances because Blyden had earlier been informed of his *Miranda*[19] rights.

■■ At the outset, we note that Blyden admits on appeal that he never objected *at trial* to the admission of the inculpatory statements. (Appellant Br. 26, 29.) The record reveals, however, that Blyden's pre-trial motion to suppress sought suppression of his inculpatory statements, in addition to all of the physical evidence seized by the police. At the suppression hearing, the trial court held that the statements were admissible because they were made voluntarily and not as a result of in-custody interrogation. (H'rg Tr. 78-79.) "Generally . . . the overruling of a pretrial motion to suppress the use at the trial of particular evidence preserves the point and renders it unnecessary again to object when such evidence is offered at the trial." *Lawn v. United States*, 355 U.S. 339, 353,

---

[18] The Fifth Amendment to the United States Constitution is applicable in the Virgin Islands pursuant to § 3 of the Revised Organic Act of 1954, as amended, 48 U.S.C. § 1561.

[19] In *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that:

when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

78 S. Ct. 311, 320, 2 L. Ed. 2d 321, 1958-1 C.B. 540 (1958). Thus, despite Blyden's failure to object to the admission of his statements at trial, this issue was properly preserved for appellate review when the trial court denied Blyden's pre-trial motion to suppress the inculpatory statements after the suppression hearing. *See, e.g., State v. Van Ackeren*, 200 Neb. 812, 265 N.W.2d 675, 678 (1978) ("Where a defendant has filed a timely pretrial motion to suppress evidence, and such motion is denied by the District Court after hearing, an objection at trial to the introduction of the evidence, or the renewal of the motion to suppress, is not essential to preserve the question for review."); *State v. Hazelton*, 330 A.2d 919, 922 (Me. 1975) ("[W]e decide that a pre-trial ruling denying a . . . motion to suppress ipso facto saves defendant's point for appellate review in terms of the record of the pretrial suppression hearing; defendant need raise no further objection at trial when the matters previously sought to be suppressed are offfered (sic) as evidence . . . .").

██ Having established that this issue is properly before this Court, we must determine whether the trial court's admission of the inculpatory statements at trial violated Blyden's rights under the Fifth Amendment. Importantly, it is well established that a spontaneous utterance, not prompted by a police interrogation, made by a suspect who is plainly in custody is admissible even if the suspect has not waived his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("Any statement given freely and voluntarily without any compelling influence is, of course, admissible into evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *see also United States v. Avery*, 717 F.2d 1020, 1025 (8th Cir. 1983) (collecting cases). Indeed, "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2264, 176 L. Ed. 2d 1098 (2010).

As we have held above, Blyden was lawfully arrested when the recovery of the firearm ripened the officers' reasonable suspicion to stop and frisk into probable cause for an arrest. According to Dowdye's suppression hearing testimony, which was read at trial, Dowdye informed Blyden of his *Miranda* rights in the police station parking lot but did not have Blyden sign an advice of rights form. At the police station, Blyden

was seated at Dowdye's desk waiting to be taken to the Major Crimes Unit when Dowdye asked Blyden some questions about the previous, unrelated shooting of Blyden's brother. Significantly, Blyden testified at trial that he did not respond to Dowdye's questions about his brother's shooting. (Trial Tr. vol. IV, 107.)[20] However, sometime thereafter, Blyden uttered that "he saw one of the guys who had shot his younger brother looking at him so he doubled back and put some shots in him just like they did his brother." (Trial Tr. vol. IV, 33.) Blyden also uttered that "if it takes him [twenty] years he is going to murder those mother fuckers himself." (*Id.* at 35.) The record clearly establishes that, after being transported to the Major Crimes Unit, Corporal Pierre Bedminster ("Bedminister") read Blyden his *Miranda* rights, and also had Blyden sign an advice of rights form confirming that he had been warned of his rights. (*Id.* at 118-19.) Thereafter, the police were preparing to transfer Blyden from the Major Crimes Unit to the prison when he stated without prompting, "To see that I could have been going home to sleep in my warm bed tonight instead of this stinking jail cell . . . it's worth it because the fucker violated." (Trial Tr. vol. II, 253-54.)

 Under the circumstances of this case, the statements made by Blyden while he was waiting to be transferred to the Major Crimes Unit and while he was being prepared for transfer to the prison were admissible at trial under *Miranda* even though Blyden did not waive his rights. *See* 384 U.S. at 478. It is evident from the record that the second inculpatory statement was entirely spontaneous and not made in response to any police questioning. There is nothing in the record to indicate that Blyden did not understand his *Miranda* rights. Additionally, although the record reveals that Dowdye asked Blyden questions concerning his brother's unrelated shooting, Blyden himself testified that he did not respond to Dowdye's questions. Notably, Blyden's initial silence may be viewed as evidence that he in fact understood his right to remain silent. Consequently, Blyden's first inculpatory statement was also clearly spontaneous and not made in response to any police interrogation. Accordingly, we conclude that the trial court did not err in finding that

---

[20] When asked at the suppression hearing whether he "ha[d] any conversations while Detective Dowdye was questioning [him]," Blyden testified "No."

Blyden's statements were made voluntarily and not as a result of custodial interrogation.[21]

## F. Blyden's Conviction for Unauthorized Possession of Ammunition Requires Reversal

■■ ■■ The People charged Blyden with, and the jury found him guilty of, unauthorized possession or sale of ammunition pursuant to 14 V.I.C. § 2256. However, this Court has previously observed that, although "Virgin Islands law proscribes possession of ammunition without authorization . . . it does not establish a mechanism for authorizing possession of ammunition." *Smith v. People*, 51 V.I. 396, 402 (V.I. 2009) (citing *United States v. Daniel*, 518 F.3d 205, 208, 49 V.I. 1169 (3d Cir. 2008)) (reversing conviction for unauthorized possession of ammunition); *see also Mulley v. People*, 51 V.I. 404, 407 (V.I. 2009) (same). Significantly, "[w]ithout any such mechanism . . . the People could not show that [Blyden] was not authorized to possess ammunition." *Smith*, at 402. Furthermore, although Blyden has not challenged the sufficiency of the evidence on appeal, the People's failure to prove an essential element of a crime is a "fundamental error which may be noticed by an appellate court notwithstanding the defendant's failure to raise it . . . ." *Stevens v. People*, 52 V.I. 294, 309 (V.I. 2009) (quoting *United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997)) (reversing conviction for unauthorized possession of ammunition). Accordingly, we reverse Blyden's conviction for unauthorized possession of ammunition.

---

[21] However, even if Blyden's earlier statement was not clearly admissible, "[w]here a subsequent confession is obtained constitutionally, the admission of prior inadmissible confessions may constitute harmless error." *United States v. Johnson*, 816 F.2d 918, 923 (3d Cir. 1987). *See also Bryant v. Vose*, 785 F.2d 364, 367 (1st Cir. 1986) (holding that admission of oral statement in violation of *Miranda* was harmless error because it was cumulative of subsequent properly-admitted written statement); *United States v. Packer*, 730 F.2d 1151, 1157 (8th Cir. 1984) (holding that admission of statements obtained in violation of *Miranda* was harmless error given overwhelming evidence of guilt, including constitutionally-obtained subsequent statements and physical evidence). Thus, even if, as Blyden contends, he was not read his rights prior to him making his first statement, Blyden's first statement would be cumulative of his properly-admitted subsequent statement. Moreover, it is clear from our review of the trial transcript that the People presented other overwhelming evidence of Blyden's guilt, including ample physical and testimonial evidence. Therefore, any error in the admitting the first statement would have been harmless.

## III. CONCLUSION

First, this Court holds that Blyden's Fourth Amendment rights were not violated by the admission of the physical evidence at trial, because the firearm was obtained pursuant to a valid *Terry* stop and the additional seized items were obtained pursuant to a search incident to a lawful arrest. Second, we do not find any Sixth Amendment error in admitting Dowdye's suppression hearing testimony at trial; however, any error would have been harmless because the pre-trial testimony was, at most, cumulative of other testimony properly admitted at trial. Third, we hold that the admission of the firearm into evidence was not an abuse of discretion. Fourth, we hold that there was no Fifth Amendment violation in the admission of Blyden's inculpatory statements, because both statements were voluntarily and spontaneously made after Blyden was advised of his rights. Finally, we hold that our prior decisions require us to reverse Blyden's conviction for unauthorized possession of ammunition. Accordingly, we affirm the Superior Court's September 25, 2007 Judgment as to all counts, except that we reverse Blyden's count eight conviction for unauthorized possession of ammunition pursuant to 14 V.I.C. § 2256 and vacate the portion of his sentence related thereto.[22]

---

[22] Our reversal of the unauthorized possession of ammunition charge does not require a remand to the trial court for resentencing because Blyden's five-year prison sentence for the improper ammunition conviction runs concurrent to his sentence of life imprisonment without parole for his first degree murder conviction which we have affirmed herein.