**JEFFREY BROWNE, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2010-0069

Supreme Court of the Virgin Islands

February 2, 2012

207

209

211

213

ANDREW L. CAPDEVILLE, ESQ., Law Offices of Andrew L. Capdeville, P.C., St. Thomas, USVI, *Attorney for Appellant*.

TIFFANY V. MONROSE, ESQ., Department of Justice, St. Thomas, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; SWAN, *Associate Justice*; and HODGE, *Designated Justice*.[1]

## OPINION OF THE COURT

(February 2, 2012)

HODGE, *Chief Justice*. Jeffrey Browne was charged and convicted of two counts of first degree murder, four counts of attempted first degree murder, four counts of third degree assault, reckless endangerment, unauthorized possession of a firearm, and interference with an officer discharging his duties for his involvement in a shooting that occurred at a public housing community on Christmas morning in 2007. On appeal, Jeffrey[2] challenges the admission of evidence seized from his vehicle, statements made by his wife, and the death certificates of two of the victims. He also claims that juror misconduct, as well as the Superior Court's failure to grant his motion for a change of venue and to allow him to call several rebuttal witnesses, denied him a fair trial. For the reasons discussed below, we affirm the judgment of the Superior Court.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

In the early morning hours on December 25, 2007, Marsela Jarvis, a resident of a public housing community in St. Croix, noticed a suspicious silver/grayish car driving slowly around the housing community with its headlights turned off. (J.A. Vol. V 130-32.) At the time she noticed the car, Marsela was standing on the front porch of her apartment. She continued to watch the car circle around the housing community because there had been a high frequency of shootings occurring in that area. (J.A. Vol. V

---

[1] Associate Justice Maria M. Cabret has been recused from this matter. The Honorable Verne A. Hodge, a retired judge of the Superior Court, sits in her place by designation pursuant to title 4, section 24(a) of the Virgin Islands Code.

[2] To avoid confusion, we will use the first names of Jeffrey Browne and his wife Marcella Browne.

132.) As the car passed by her apartment several times, Marsela was able to identify two of its occupants. She testified that the driver of the vehicle was Jeffrey Browne, and that Luis Melendez was riding in the front passenger seat. (J.A. Vol. V 133-35.) She further testified that after circling around the housing community several times, Jeffrey and Melendez drove towards a group of people who were hanging out in front of one of the housing community's apartment buildings. The car then turned on its headlights and Melendez fired four shots at the group of people from the passenger seat of the vehicle as the car passed the apartment building. (J.A. Vol. V 136-37.) Jeffrey then turned the car around, and as they passed by the group a second time Melendez — this time sitting in the window of the passenger seat with a long gun rested on the roof of the car — opened fire on the group again. (J.A. Vol. V 138-40.) When Melendez opened fire on the group of people, Marsela testified that everyone in the area began to run for cover, but some of the people, including Allen Burke, appeared to "trip-up" and fall to the ground. (J.A. Vol. V 137-39.)

Multiple witnesses to the shooting, including Rodney Barbel, Adowa Flemming, and Euclyn Prentice, who were among the group of people hanging out in front of the apartment building when the shooting began, substantially corroborate Marsela's testimony. (J.A. Vol. V 175-91, 199-218.) Prentice and Flemming testified that although they could not identify any of the occupants of the vehicle that opened fire on them, they recognized the vehicle used in the shooting as belonging to Jeffrey and indentified Jeffrey and Marcella Browne's silver Hyundai Brio as that car.[3] (J.A. Vol. V 175-91, 199-218, 212, 255.) Nioka Shaw and Martika Jarvis each testified that they had witnessed parts of the shooting from their respective apartments in the housing community, and that they saw Jeffrey driving the car used in the shooting. (J.A. Vol. VI 31-32, 101-04.)

As a result of the shooting, Burke, Kennyetta McIntosh, Prentice, Flemming, and Jesus Serrano sustained gunshot wounds. (J.A. Vol. V 140-42, 235, 256.) Burke and McIntosh were severely wounded, lying on the ground, and bleeding. (J.A. Vol. V 140-42.) Burke died at the scene. (J.A. Vol. VI 106, 174-76, 181-82; Vol. IX 58, 63.) McIntosh was taken to the hospital, but died shortly thereafter. (J.A. Vol. IX 58-59.)

---

[3] Barbel was not able to identify the occupants of the car involved in the shooting or the car itself.

Members of the Virgin Islands Police Department (VIPD), in the late morning hours of December 25, discovered Jeffrey's silver Hyundai Brio parked at a second public housing community, which is located relatively close to the housing community where the shooting occurred. (J.A. Vol. V 43-48.) The VIPD seized the vehicle and transported it to a secure facility while they awaited a search warrant. (J.A. Vol. V 43-48.) Later that evening the VIPD obtained a search warrant for the vehicle, which they subsequently executed on December 27. (J.A. Vol. V 48-49.) During the search of the vehicle, the VIPD discovered a bullet proof vest and a spent 12 gauge shotgun shell behind the rear passenger headrest, which was similar to the spent 12 gauge shotgun shells found at the scene of the shooting. (J.A. Vol. V 49-50.) Jeffrey was arrested and charged with two counts of first degree murder, four counts of attempted first degree murder, four counts of third degree assault, reckless endangerment, unauthorized possession of a firearm, and interference with an officer discharging his duties.[4] (J.A. 26.) A jury subsequently found him guilty of all charges, and the Superior Court entered judgment and sentence on October 5, 2010. (J.A. 23-27.) Jeffrey filed his timely notice of appeal on September 1, 2010.[5] (J.A. 57-58.)

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

According to title 4, section 32(a) of the Virgin Islands Code, we possess jurisdiction "over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." Since the Superior Court's October 5, 2010 Judgment and Commitment constitutes a final judgment, this Court possesses jurisdiction over Jeffrey's appeal.

Our standard of review in examining the Superior Court's application of law is plenary, while findings of fact are reviewed only for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I.

---

[4] Melendez and Marcella were also arrested and charged for their alleged involvement in the December 25, 2007 shooting. However, they are not parties to this appeal.

[5] *See* V.I.S.CT.R. 5(b)(1) ("A notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment.").

2007). Likewise, when a case involves the interpretation of the United States Constitution, our standard of review is plenary.[6] *Latalladi v. People*, 51 V.I. 137, 141 (V.I. 2009).

## B. The Seizure and Search of Jeffrey's Vehicle

Jeffrey argues that the VIPD seized his car without probable cause or a valid search warrant in violation of the Fourth Amendment. He thus contends that the Superior Court should have suppressed all evidence that was subsequently discovered from that vehicle.

■ The Fourth Amendment prohibits unreasonable searches and seizures, and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). One such exception is the automobile exception. Under the automobile exception to the warrant requirement, law enforcement may seize and search an automobile without a warrant if probable cause exists to believe it contains evidence of criminal activity. *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996); *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002). "Probable cause exists when, under the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (per curiam) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). "The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts." *Coolidge v. New Hampshire*, 403 U.S. 443, 510, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

■ Applying that standard to the facts of this case, even assuming, although not deciding, that the police did illegally seize Jeffrey's vehicle, the evidence subsequently discovered pursuant to a valid warrant was

---

[6] The Bill of Rights of the Constitution of the United States, contained in the Revised Organic Act of 1954 and statutorily conferred by Congress, "expresses the congressional intention to make the federal Constitution applicable to the Virgin Islands to the fullest extent possible consistent with its status as a territory." *In re Brown*, 439 F.2d 47, 50-51, 8 V.I. 313 (3d Cir. 1971).

nevertheless admissible because none of the information on which the warrant was secured was derived from or related in any way to the alleged illegal seizure. Jeffrey's vehicle was seized at approximately 10 a.m. on December 25, 2007. Later that evening, however, the VIPD obtained a search warrant for the vehicle based on the affidavit of Officer Richard Matthews. In his affidavit, Officer Matthews states that one of the individuals who sustained gunshot wounds during the shooting identified the vehicle used in the shooting as belonging to Jeffrey. The individual further stated that he was familiar with Jeffrey's vehicle and that he had seen it in the vicinity of the housing community immediately prior to the shooting. Based on this information, it was reasonable for the police and the Superior Court judge issuing the warrant to believe that there was a fair probability that evidence of the shooting would be found in Jeffrey's vehicle.[7] After obtaining a search warrant, the VIPD searched Jeffrey's automobile on December 27, 2007.[8]

The facts of this case are similar to those presented to the United States Supreme Court in *Segura v. United States*, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). There, the police had information of drug trafficking in a particular apartment. *Id.* at 800. Prior to obtaining a warrant, however, the police went to the apartment and conducted an illegal entry and seizure of the premises. *Id.* at 802. A warrant was later issued some nineteen hours after the illegal seizure of the premises based solely on information known to the agents before the illegal entry. *Id.* at 801-02. The issue before the Supreme Court was whether the drugs and other evidence not observed during the initial illegal seizure, but first discovered by the police the day after the illegal seizure, under an admittedly valid search warrant, should have been suppressed. *Id.* at 804. The Court held that the evidence obtained pursuant to the authorized search was admissible notwithstanding the prior illegal seizure. *Id.* at 813-14. In reaching this conclusion, the Court reasoned:

---

[7] Jeffrey has not challenged the validity of the search warrant or the actual search of his vehicle. In fact, at oral arguments Jeffrey's attorney conceded that the search warrant was valid. Rather, he contends that the illegal seizure of his vehicle by the VIPD on December 25, 2007, prior to obtaining a search warrant and without probable cause, was unconstitutional and that, as a result, all evidence subsequently discovered in that vehicle was inadmissible.

[8] The search revealed a spent shotgun shell, which was similar to the spent shotgun shells found at the scene of the shooting. (J.A. Vol. V 49-50.)

None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged. This evidence was discovered the day following the entry, during the search conducted under a valid warrant; it was the product of that search, wholly unrelated to the prior entry. The valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry. *Wong Sun*, 371 U.S., at 488. Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here. The legality of the initial entry is, thus, wholly irrelevant under *Wong Sun*, supra, and *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319, T.D. 2984, 17 Ohio L. Rep. 514 (1920).

*Id.* at 814-15. The Court thus declined to apply the exclusionary rule because the illegal entry and seizure "did not contribute in any way to discovery of the evidence seized under the warrant." *Id.* at 815.

Similarly, in *United States v. Glover*, 9 Fed. Appx. 167, 169 (4th Cir. 2001) (unpublished), the police, without having obtained a search warrant, towed Glover's vehicle from a parking garage to the FBI vehicle impoundment lot. Several hours later the police applied for search warrants covering Glover's apartment and vehicle. *Id.* The judge issued a warrant as to the apartment, but denied a warrant for the vehicle. *Id.* The police immediately executed a search of Glover's apartment, which produced incriminating evidence. *Id.* Using this additional evidence, the police were able to reapply and obtain a warrant for Glover's vehicle. *Id.* And the subsequent search of Glover's vehicle allowed the police to discover further incriminating evidence, which was used to convict Glover at trial. *Id.* at 170. On appeal, Glover argued that the impoundment of his car constituted an illegal seizure and this illegality tainted the

evidence obtained during the subsequent search of the car, although the search itself was conducted pursuant to a valid warrant.[9] *Id.* at 168. The court concluded that the evidence discovered in Glover's car was admissible because the search was conducted pursuant to a properly issued search warrant and was supported by probable cause acquired independently of the contested impoundment.[10] *Id.* at 171-72. The court stated:

> As we have emphasized, the police did not acquire any information about the contents of Glover's car when they impounded it, and there was absolutely no causal nexus between the seizure and the subsequently issued search warrant. Had the police officers simply maintained their surveillance of Glover's car for several hours and impounded it after the apartment search had been completed, the car's contents would have been discovered and unquestionably admitted.

*Id.* at 172.

 The facts of the case before us are similar to those in *Segura* and *Glover*. The evidence discovered in Jeffrey's car was obtained as the result of a search, which standing alone would have been unquestionably valid. In addition, "the police did not acquire any information about the contents of [Jeffrey's] car when they impounded it, and there was absolutely no causal nexus between the seizure and the subsequently issued search warrant." *See Glover*, 9 Fed. Appx. at 172. Thus, the search conducted pursuant to the valid warrant was a "means sufficiently distinguishable" to purge the evidence discovered in Jeffrey's car of any "taint" arising from the purported illegal seizure. *See Segura*, 468 U.S. at 814-15; *see also United States v. Charles*, 290 F. Supp. 2d 610, 617 (D.V.I. 1999). If the VIPD had simply maintained their surveillance of Jeffrey's car for several hours and impounded it after they had obtained the search warrant, the evidence in the vehicle would have been discovered and unquestionably admitted. *See Segura*, 468 U.S. at 815; *Glover*, 9 Fed. Appx. at 172. The illegality, if any, of the initial seizure is

---

[9] Glover's vehicle remained parked and secured on the FBI impoundment lot from the time it was initially impounded until the eventual issuance of the search warrant some four days later. *Id.* at 169 n.3.

[10] The court assumed, without concluding, that probable cause did not exist at the time the police impounded Glover's car. *Id.* at 170.

thus irrelevant, as the warrant was properly issued and free from any taint of the alleged illegal seizure of the vehicle.[11] *See Segura*, 468 U.S. at 815 ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity.") (internal quotation marks omitted). Therefore, we affirm the order of the Superior Court denying Jeffrey's motion to suppress evidence seized from his 2007 Hyundai Brio.[12] *See Segura*, 468 U.S.at 815.

## C. The Admission of Marcella Browne's Statement

Jeffrey next argues that the trial court erred in admitting a portion of Marcella Browne's February 4, 2008 statement that she made to the VIPD. He contends that the February 4, 2008 statement implicates him in the shooting. And since Marcella was a co-defendant at his trial and he was not able to cross-examine her about the statement, its admission into evidence violated his Sixth Amendment right to confront the witnesses against him. In support of this argument, Jeffrey relies on the Supreme Court's holdings in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) and *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

■ The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. The Confrontation Clause affords criminal defendants both the right to

---

[11] Our holding should not be read as sanctioning police conduct intended to hold a suspect's car without probable cause while the police attempt to gather additional information. Such conduct would be a clear violation of the Fourth Amendment. We hold only that evidence obtained even from an illegally seized vehicle is not subject to the exclusionary rule when it was subsequently discovered pursuant to a validly issued warrant and free from any taint of an illegal seizure.

[12] Jeffrey also appears to argue that the evidence seized from his vehicle should have been excluded because the VIPD failed to maintain a proper chain of custody over the key to his vehicle. This argument, however, ignores the fact that the key to Jeffrey's vehicle was *not* evidence. Rather it was merely one of several means that the VIPD could have used to access Jeffrey's car. Moreover, "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 2532 n.1, 174 L. Ed. 2d 314 (2009); *United States v. Dent*, 149 F.3d 180, 188-89 (3d Cir. 1998).

confront and to cross-examine adverse witnesses. *See Maryland v. Craig*, 497 U.S. 836, 845-46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (holding the Confrontation Clause encompasses the right to "personal examination . . . [and] insures that the witness will give his statements under oath . . . [and] submit to cross-examination") (internal quotation marks and citation omitted). In *Crawford*, the United States Supreme Court held that the Confrontation Clause prohibits the admission of an individual's testimonial statement against the accused when that individual does not appear at trial, "unless he [is] unavailable to testify, and the defendant [has] had a prior opportunity for cross-examination." 541 U.S. at 53-54. The Court further noted that custodial examinations and formal statements made to government officers clearly fall within the definition of a testimonial statement. *Id.* at 51.

■ In *Bruton*, the Court held that a defendant is deprived of his rights under the Sixth Amendment's Confrontation Clause when a non-testifying co-defendant's statement naming him as a participant in the crime is introduced at their joint trial, even if the trial court instructs the jury to consider the statement only against the non-testifying co-defendant. 391 U.S. at 136-37. The Court expanded on *Bruton* in *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), where it held that "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." The Court further noted that "evidence [in a statement] requiring linkage differs from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce," and it declined to extend *Bruton* to "confessions incriminating by connection." *Id.* at 208-09. Thus, when a co-defendant's extrajudicial statement does not directly implicate or explicitly suggest the participation of the defendant, the *Bruton* rule does not apply. *United States v. Richards*, 241 F.3d 335, 340-41, 43 V.I. 337 (3d Cir. 2001); *United States v. Belle*, 593 F.2d 487, 493 (3d Cir. 1979). Moreover, an "evidentiary linkage or contextual implication may not be utilized to convert a non-*Bruton* admissible statement into a *Bruton* inadmissible statement." *Belle*, 593 F.2d at 494.

The following portion of Marcella's February 4, 2008 statement was admitted at trial:

222

## NARRATIVE STATEMENT

Q: On February 4, 2008 were you advised of your Miranda Rights by Detective Cureene Smith?

A: Yes.

Q: Did you understand those rights?

A: Yes.

Q: Are you willing to make a statement?

A: Yes.

Q: On December 25, 2007, you were interviewed by Detective R. Matthews, C. Smith and I, at Marshall Command Police station, did you remember giving us a statement on that day?

A: Yes.

Q: In your statement you stated that you went with the vehicle from your house around "Twelvish" was that a true statement?

A: No.

In his brief, Jeffrey contends that Marcella's statement included the following question and answer:

Q: In your [December 25, 2007] statement you stated that you went with the vehicle from you [sic] house around "Twelvish" was that a true statement?

A: No.

Q: Did any[] of your family members or your husband told [sic] to make that statement?

A: Yes, I'm not saying who.

(Appellant's Br. 10.) Prior to its admission, however, the last question and answer were redacted and not included in the statement that was admitted

223

into evidence at trial. Thus, on its face, this statement does not directly implicate or explicitly suggest that Jeffrey was involved in the shooting. By making the redaction discussed above, all references to Jeffrey were eliminated.

■ The People also introduced into evidence Marcella's December 25, 2007 statement, in which she told police that on December 25, 2007, at approximately midnight, she had left her residence in her and Jeffrey's silver 2007 Hyundai Brio, and that when she left her house, Jeffrey and her brother Melendez were there with her children. (J.A. Vol. IX 34.) While we recognize that viewing Marcella's February 4, 2008 statement in light of her December 25, 2007 statement could tend to suggest that Jeffrey may have been involved in the shooting, any possible "evidentiary linkage or contextual implication" that may have been drawn from viewing these statements together will not affect the admissibility of Marcella's February 4 statement because it does not expressly implicate Jeffrey in the shooting. *See Belle*, 593 F.2d at 493-94. "Statements that are incriminating only when linked to other evidence in the case do not trigger application of *Bruton*'s preclusionary rule." *United States v. Vega Molina*, 407 F.3d 511, 520 (1st Cir. 2005) (citing *Richardson*, 481 U.S. at 208). Here, Marcella's February 4, 2008 statement is, at best, a "confession[] incriminating by connection." *See Richardson*, 481 U.S. at 208-09. Accordingly, Marcella's February 4, 2008 statement was admissible under *Bruton*.

■ Despite our conclusion that Marcella's February 4, 2008 statement was admissible under *Bruton*, the trial court nonetheless erred in failing to instruct the jury that Marcella's statement could only be used as evidence against her and not against Jeffrey. It is clear from Supreme Court case law "that the trial court ordinarily should instruct the jury that one defendant's out-of-court [statement] may not be used against his codefendants in a joint trial." *See Vega Molina*, 407 F.3d at 521 (citing *Gray v. Maryland*, 523 U.S. 185, 192, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998); *Richardson*, 481 U.S. at 206; *Bruton*, 391 U.S. at 137). Since Marcella's February 4, 2008 statement was not independently admissible against Jeffrey, the trial court was required to give the jury a limiting instruction. We are convinced beyond a reasonable doubt, however, that under the circumstances the trial court's failure to instruct the jury that Marcella's statement could not be used as evidence against Jeffrey was

224

harmless. *See United States v. Hardwick*, 544 F.3d 565, 574 (3d Cir. 2008).

As discussed above, Marcella's statement was not inculpatory on its face, and it did not directly implicate or explicitly suggest that Jeffrey was involved in the shooting. Further, the portion of Marcella's statement involving Jeffrey was completely removed, which left the jury unaware of the redaction. Whatever incriminating value Marcella's statement may have had with respect to Jeffrey's involvement in the shooting was derived by inference from other evidence introduced at trial.

██ ██ Additionally, the People presented overwhelming evidence implicating Jeffrey in the shooting. Video surveillance from a casino in St. Croix showed Jeffrey and Melendez entering the casino together, and then leaving together less than an hour before the shooting. Marsela Jarvis, Martika Jarvis, and Nioka Shaw each testified that they had witnessed the shooting from their respective apartments in the housing community and indentified Jeffrey as the driver of the vehicle used to perpetrate the shooting. Marsela Jarvis further identified Jeffrey's silver Hyundai Brio as the car involved in the shooting.[13] This testimony was corroborated by multiple other witnesses to the shooting who also identified Jeffrey's car as the car used in the shooting. Finally, the VIPD discovered a spent 12 gauge shotgun shell behind the rear passenger headrest of Jeffrey's car that was similar to the spent 12 gauge shotgun shells found at the scene of the shooting. Based on this evidence, combined with the fact that Marcella's statement was at most weakly inculpatory as to Jeffrey, we are convinced beyond a reasonable doubt that the Superior Court's failure to give the jury a *Bruton* instruction did not affect the jury's verdict. *See Ferguson v. United States*, 484 F.3d 1068, 1074-75 (8th Cir. 2007) ("An evidentiary error is harmless if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.") (internal quotation marks omitted); *United States v. Esparsen*,

---

[13] Specifically, Marsela Jarvis testified Jeffrey was driving the silver Hyundai Brio, and that Melendez was riding in the front passenger seat. She further testified that Melendez fired four shots at a group of people who were in front of one of the housing community's apartment buildings as the car passed the apartment building, after which, Jeffrey turned the car around and as they passed by the group a second time Melendez — this time sitting in the window of the passenger seat with a long gun rested on the roof of the car — opened fire on the group again.

930 F.2d 1461, 1475-76 (10th Cir. 1991). Therefore, the trial court's erroneous decision to admit a portion of Marcella's statement without instructing the jury that Marcella's statement could only be used as evidence against her, and not against Jeffrey, was harmless.

## D. The Admission of Burke and McIntosh's Death Certificates

Jeffrey, as he did below, also argues on appeal that the trial court erred in admitting the death certificates of Burke and McIntosh into evidence. He contends that one of the key elements that must be established in order to convict him of murder is that the he actually killed a human being. *See* 14 V.I.C. § 921 (defining murder as the "the unlawful *killing of a human being* with malice aforethought.") (emphasis added). In order to establish that Burke and McIntosh died from gunshot wounds sustained from the December 25 shooting, the People introduced two death certificates prepared by Doctor D'Michelle P. DuPre, the medical examiner, stating that Burke and McIntosh died in the early morning hours on December 25, 2007 of multiple gunshot wounds. (J.A. 586-87; Vol. IV 108.) Dr. DuPre further classified their deaths as homicides. (J.A. 586-87.) However, Dr. DuPre did not testify at trial and Jeffrey objected to the admission of the death certificates on multiple grounds, including his right to cross examine Dr. DuPre. (J.A. Vol. IV 102.) The trial court overruled Jeffrey's objection and admitted the death certificates into evidence. On appeal, Jeffrey reasserts that the admission of the death certificates into evidence without allowing him to cross-examine the individual who prepared those documents violated the Sixth Amendment's Confrontation Clause. He argues that the death certificates are the functional equivalent to in-court testimony, and since he did not have the opportunity to cross-examine their author, Dr. DuPre, they are inadmissible under the Confrontation Clause.

As discussed above in part II.C., the Confrontation Clause bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54. The Supreme Court has held that in order for a statement to qualify as "testimonial," it must have a "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *See Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *see also Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 2714 n.6,

226

180 L. Ed. 2d 610 (2011). In *Melendez-Diaz v. Massachusetts*, the Court addressed whether affidavits reporting the results of forensic analysis were "testimonial," rendering the affiants "witnesses" subject to the defendant's right of confrontation under the Sixth Amendment. 557 U.S. 305, 129 S. Ct. 2527, 2530, 174 L. Ed. 2d 314 (2009). The evidence at issue identified a substance seized by law enforcement officers and linked to defendant as cocaine. *Id.* The Court determined that forensic analyses qualify as "testimonial" statements, and forensic analysts are "witnesses" to whom the Confrontation Clause applies. *See id.* at 2532. In reaching this conclusion, the Court focused on the fact that the laboratory report was used to establish a fact that was necessary to convict. *Id.* at 2533-34. The Court further specifically referenced autopsy examinations as one such kind of testimonial forensic analysis. *See id.* at 2536 n.5.

■ Based on the Supreme Court's decisions in *Crawford* and *Melendez-Diaz*, we conclude that the introduction of the death certificates of Burke and McIntosh violated the Sixth Amendment's Confrontation Clause. *See id.* at 2536-37; *State v. Locklear*, 363 N.C. 438, 681 S.E.2d 293, 304-05 (N.C. 2009). As a medical examiner in this Territory, Dr. DuPre was employed by the Department of Justice and the Attorney General, and empowered by statute "to make inquiry into unnatural deaths" and "to investigate the death of every person" in cases in which it appears to be "a violent death," "a death caused by unlawful act or criminal neglect," or "a death occurring in a suspicious, unusual or unexplained manner." 3 V.I.C. § 115(a). When Dr. DuPre prepared these death certificates she must have been aware that Burke and McIntosh had been the victims of a shooting. A simple visual inspection would have revealed that their bodies had sustained significant wounds from gunshots. Moreover, section 115(b) required the VIPD to report the deaths of Burke and McIntosh to the medical examiner, which would have required her to go to the scene of the shooting to take custody of Burke's body. *See* 3 V.I.C. § 115(b) ("When the Medical Examiner is so informed of a death within his jurisdiction he shall go at once to the place where the body is and take charge of it."). It could not have escaped Dr. DuPre's notice that her autopsy findings regarding the cause of death of Burke and McIntosh "would likely be used in a criminal homicide investigation and at any resulting judicial proceeding." *See United States v. Williams*, 740 F. Supp. 2d 4, 7 (D.D.C. 2010) (holding autopsy report and death certificate are testimonial and inadmissible under the Confrontation Clause unless

the author is subject to cross-examination at trial). This conclusion is further supported by the fact that Dr. DuPre listed "multiple gunshot wounds" as the causes of death and characterized the deaths as homicides. The fact that Dr. DuPre characterized the deaths of Burke and McIntosh as homicides, as opposed to accidents or undetermined, indicates that her investigation had gone beyond merely examining their bodies. Thus, although Dr. DuPre may not have completed Burke and McIntosh's death certificates solely for use in a future prosecution, there can be no doubt that she was aware that her report "would be available for use at a later trial." *See Crawford*, 541 U.S. at 52.

 Additionally, the death certificates of Burke and McIntosh "are marked by a formality characteristic of documents to be introduced in court." *See Williams*, 740 F. Supp. 2d at 7 (citing *Melendez-Diaz*, 129 S. Ct. at 2543 (Thomas, J., concurring)). The death certificate of each of the individuals is a standard form with typed headings and space provided for the pathologist to record information such as the decedent's name, Social Security number, next of kin, and cause of death, among other details. The medical examiner further signs this document certifying that "[o]n the basis of the examination of the body and/or the investigation, in my opinion, death occurred on the date and due to the causes stated." The death certificates thus "bear the hallmarks of official documents, making 'solemn declaration[s] or affirmation[s] . . . for the purpose of establishing or proving some fact.' " *Id.* at 8 (quoting *Melendez-Diaz*, 129 S. Ct. at 2532). And since the People failed to show that Dr. DuPre was unavailable to testify and that the defendant had been given a prior opportunity to cross-examine her, admitting the death certificates into evidence violated Jeffrey's constitutional right to confront the witnesses against him.[14]

---

[14] We recognize that since the Virgin Islands Code requires certificates of death to be filed with the registrar of vital statistics for all deaths occurring in the Virgin Islands, *see* 3 V.I.C. § 418(a)(12); 19 V.I.C. §§ 861, 866, 1703, death certificates would be admissible as an exception to the hearsay rule by virtue of Federal Rule of Evidence 803(9), even though its author is available, *see* FED. R. EVI. 803(9) (records of vital statistics exception to rule against hearsay). However, the United States Supreme Court has clearly held that in addition to qualifying under an exception to the hearsay rules, a statement must also be non-testimonial in order to be admissible absent confrontation. *See Melendez-Diaz*, 129 S. Ct. at 2539-40 (holding that even if a statement qualifies for admission under an exception to the hearsay rules, if it is testimonial its maker is subject to confrontation under the Sixth Amendment).

The admission of the death certificates in this case, however, was harmless because we are convinced beyond a reasonable doubt that their admission into evidence at trial did not contribute to the verdict obtained. *See Hardwick*, 544 F.3d at 574. The death certificates were introduced to establish that Burke and McIntosh died as a result of multiple gunshot wounds that they sustained from the December 25 shooting. However, even ignoring the death certificates, we find that the People presented copious evidence that Burke and McIntosh died as a result of the shooting. Multiple witnesses testified that Burke and McIntosh were both shot during the shooting. Sergeant Dino Herbert further testified that he personally observed Burke's body at the scene of the shooting shortly after the incident and McIntosh's body at the hospital a few hours later, and that both individuals were deceased.[15] (J.A. Vol. IX 58-59, 63.) This evidence establishes beyond a reasonable doubt that Burke and McIntosh died as a result of multiple gunshot wounds that they sustained in the shooting on December 25, 2007 at the housing community, and the erroneously admitted death certificates regarding Burke and McIntosh's causes of death would not have influenced the jury's verdict and were therefore harmless.[16] *See Locklear*, 681 S.E.2d at 304 (holding erroneous admission of autopsy report that tended to establish decedent's cause of death was harmless error).

### E. Jeffrey's Right to Call Rebuttal Witnesses

Jeffrey also argues that the trial court erred when it prohibited him from calling several witnesses to rebut testimony given by several of the People's witnesses. He claims that he was prohibited from calling 1) Dr. Thelma Watson, who would have testified that Dr. DuPre was not licensed to practice medicine in the Virgin Islands and thus not permitted to issue death certificates for Burke and McIntosh; 2) Officer Rolando Huertes, who would have refuted Edwin Estien's testimony; 3) Patricia Schrader-Cooke, Estien's attorney, who would have testified that he had

---

[15] Pictures of Burke's body at the crime scene verify that he died immediately after the shooting. (J.A. Vol. VI 174, 181-82.)

[16] Jeffrey also argues that the death certificates were not legally valid and should not have been admitted into evidence because Dr. DuPre was not licensed to practice medicine in the Virgin Islands when she prepared the death certificates. Since the admission of the death certificates was harmless, we need not address this issue.

229

an incentive to testify against Browne; and 4) Assorted 9-1-1 dispatchers, who would have 'testified that there were several 9-1-1 calls received on December 25, 2007, which gave conflicting descriptions of the vehicle involved in the shooting. (Appellant's Br. 21-22.)

■ Contrary to Jeffrey's argument on appeal, there is no indication from the record that he ever attempted to call any 9-1-1 dispatchers as witnesses or that the trial court prohibited him from doing so. It is also not clear from the record whether Jeffrey ever attempted to call Dr. Watson as a witness or exactly what he expected from her testimony. During a sidebar discussion concerning the admissibility of Burke and McIntosh's death certificates, Jeffrey's attorney indicated that he planned to call a representative from the Health Department to testify that Dr. DuPre was not licensed to practice medicine in the Virgin Islands on December 25, 2007. (J.A. Vol. IV 106.) The trial court held that the witness could testify as to whether the death certificates were validly issued, but not simply that Dr. DuPre was not licensed to practice medicine in the Virgin Islands. Jeffrey, however, never disclosed the identity of the witness. Nor did he ever call any such witness. More importantly, we already determined that the introduction of the death certificates, while improper, was harmless. Thus, even if the trial court prohibited Jeffrey from calling Dr. Watson to rebut Dr. DuPre's statements, it would not constitute reversible error. *See United States v. Irving*, 665 F.3d 1184, 1209 (10th Cir. 2011).

■ Jeffrey's request to call Officer Huertes and Attorney Schrader-Cooke apparently occurred in chambers and was not made part of the record on appeal. (J.A. Vol. IX 6-7.) However, the trial court later noted on the record that Jeffrey had requested to call Officer Huertes and Attorney Schrader-Cooke and summarized its reasons for denying Jeffrey's request. With respect to Officer Huertes, the trial court determined that his proposed testimony would have merely relayed inadmissible hearsay conversations that he had with Jeffrey, and it declined to allow him to testify.[17] (J.A. Vol. IX 9.) The trial court, however, failed to specifically state on the record what the substance of

---

[17] It also appears that Officer Huertes may have intended to serve as a character witness for Jeffrey. The trial court stated that a portion of his proposed testimony would be vouching for Jeffrey's good character. For that purpose the trial court excluded Officer Huertes's testimony because Jeffrey had failed to disclose him as a witness prior to jury selection. On appeal, however, Jeffrey has only challenged the trial court's decision to prohibit him from calling Officer Huertes to rebut Estien's testimony. Accordingly, we will not address whether

Officer Huertes's proposed testimony would have been if he had been allowed to testify. Further, the appellant bears the burden in the trial court of creating the record for appeal, and if the record does not establish a basis for reversal, we must affirm the trial court. *United States v. Coveney*, 995 F.2d 578, 587 (5th Cir. 1993). Since Jeffrey's initial in-chambers request to call Officer Huertes was not made part of the record and neither the trial court nor Jeffrey specifically stated the substance of his proposed testimony on the record, we cannot evaluate Officer Huertes's proposed testimony. We must therefore conclude that the trial court did not err in prohibiting Officer Huertes from testifying.

The trial court also prohibited Jeffrey from calling Attorney Schrader-Cooke as a witness. Jeffrey proffered that Attorney Schrader-Cooke would testify that she represented Estien in a criminal matter in the District Court, and that the government told Estien that it would consider recommending a sentence of probation for his gun possession charge if he cooperated with the People and testified at Jeffrey's trial. This, Jeffrey argued, tended to show that Estien expected to receive some sort of consideration in exchange for his testimony. The trial court, however, concluded that Attorney Schrader-Cooke's proposed testimony was not inconsistent with Estien's testimony. It noted that Estien only testified that he did not have an agreement with the government for favorable treatment in exchange for his testimony, and that this was consistent with Attorney Schrader-Cooke's proposed testimony. (J.A. Vol. IX 7.) The trial court also stated that Jeffrey had failed to disclose Attorney Schrader-Cooke as a witness prior to trial and her name was not announced to the potential jurors during jury selection. Finally, the trial court noted that allowing Attorney Schrader-Cooke to testify would breach her attorney-client relationship with Estien, whom she currently represented. The trial court thus declined to allow Attorney Schrader-Cooke to testify. (J.A. Vol. IX 8.)

■ To begin, the trial court misconstrued Estien's testimony. On both direct and cross-examination, Estien denied that he made any kind of "deal" with the government or that he was expecting to receive any consideration for his testimony. (J.A. VIII 8-9, 27.) Estien even specifically denied that he was expecting to receive a sentence of

---

the trial court erred in prohibiting Jeffrey from calling a character witness because he had not disclosed that witness prior to jury selection.

231

probation for a pending gun possession charge for testifying against Jeffrey. (J.A. Vol. VIII 27.) The People, however, conceded at a sidebar conference during Estien's testimony that Estien had entered into a "deal" with the government whereby it would consider recommending a sentence of probation for his gun possession charge if he testified at Jeffrey's trial. (J.A. Vol. VIII 24-25.) "Rebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof." *United States v. Laboy*, 909 F.2d 581, 588 (1st Cir. 1990). Here, Attorney Schrader-Cooke was being called by Jeffrey to testify that the government told Estien that it would consider recommending a sentence of probation for his gun possession charge if he testified at Jeffrey's trial. This directly contradicts Estien's testimony that there was no "deal" between him and the government (J.A. Vol. VII 27), and it tends to refute his testimony that he did not expect to receive some sort of consideration in exchange for his testimony. (J.A. Vol. VIII 8-9.) Accordingly, the trial court erred in concluding that Attorney Schrader-Cooke's proposed testimony was not inconsistent with Estien's testimony.

██ ██ The trial court also concluded that Jeffrey had failed to disclose Attorney Schrader-Cooke as a witness prior to trial and her name was not announced to the potential jurors prior to jury selection. However, it is not clear what authority would allow the trial court to prohibit rebuttal witnesses from testifying merely because the defendant failed to disclose them prior to jury selection. Rebuttal witnesses, by their very nature, cannot always be determined until the opposing party has presented its case in chief. Even assuming that Jeffrey could have anticipated the need to call Attorney Schrader-Cooke as a rebuttal witness, there is no rule or statute which required him to disclose her as a witness prior to trial. Discovery obligations concerning what information a criminal defendant is required to disclose to the government are controlled by rule or statute, *see* 22A C.J.S. *Criminal Law* § 627, and neither the Rules of the Superior Court nor the Federal Rules of Criminal Procedure require the defendant to disclose potential rebuttal witnesses to the government, whether they are reasonably known to the defendant or not.[18] In contrast, the United States Supreme Court has clearly held:

---

[18] Federal Rule of Criminal Procedure 16(b), which is applicable through Superior Court Rule 7, sets out what information is subject to disclosure by the defendant. Under Rule 16(b),

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing.

*Crane v. Kentucky*, 476 U.S. 683, 690-91, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (internal citations and quotation marks omitted).

Even if we were to find that the Superior Court has the authority to require a defendant to disclose all potential witnesses prior to jury selection, the United States Supreme Court has clearly held that a defendant's failure to comply with such a request does not automatically allow a court to impose a discovery sanction that entirely excludes the testimony of a material defense witness. *See Taylor v. Illinois*, 484 U.S. 400, 409, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). While a state's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of rules relating to the identification and presentation of evidence, those rules must not be inflexible. *See id.* at 411. In determining whether to prohibit an undisclosed defense witness from testifying, the trial court must consider the defendant's right to present favorable evidence, the integrity of the adversary process,[19] the interest in the fair and efficient administration of justice, potential prejudice to the

---

the only witnesses that may need to be disclosed to the prosecution are expert witnesses. *See* FED. R. CRIM. P. 16(b)(1)(C). Additionally, the Federal Rules of Criminal Procedure also require the disclosure of alibi witnesses, *see* FED. R. CRIM. P. 12.1, and any member of a law enforcement agency on whose behalf the defendant claims to have acted in cases where a public-authority defense is involved, *see* FED. R. CRIM. P. 12.3. Attorney Schrader-Cooke does not fall into any of these categories.

[19] This depends both on the presentation of reliable evidence and the rejection of unreliable evidence.

truth-seeking function of the trial process, the reasons for failure to comply with discovery rules, and the relative ease of compliance with the rules. *Id.* at 414-16. Instances where the exclusion of witnesses will be appropriate would involve facts where the "omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." *See id.* at 415.

Under the specific facts of this case, we conclude that excluding Attorney Schrader-Cooke's testimony violated Jeffrey's constitutional right to present a defense. To begin, Attorney Schrader-Cooke's testimony was, by the People's own admission, reliable and accurate. (J.A. Vol. VIII 24-25.) Additionally, allowing her to testify that Estien had made a deal with the government whereby it would consider recommending a sentence of probation for his gun possession charge if he testified at Jeffrey's trial would not have been unfair or prejudicial to the People, as it was fully aware of these facts. There is also no indication that allowing Attorney Schrader-Cooke to testify would have impeded the judicial process. Although the trial court noted the possibility that one or more of the jurors could have some type of relationship with Attorney Schrader-Cooke that would disqualify them from fairly deciding the case, it failed to *voir dire* the jury panel to see if such a situation existed and if there were sufficient alternate jurors available to avoid declaring a mistrial. By not allowing Attorney Schrader-Cooke to testify, the trial court kept competent, reliable evidence bearing on the credibility of Estien's testimony that Jeffrey confessed to the shooting from being considered by the jury. This had the effect of prejudicing the truth-seeking function of the trial process. Finally, because Attorney Schrader-Cooke was called to rebut Estien's testimony, Jeffrey's failure to disclose her as a possible witness does not appear to be willful. Nor was this omission motivated by a desire to obtain a tactical advantage over the People, as the People were fully aware of the substance of Attorney Schrader-Cooke's proposed testimony. Thus, Jeffrey's failure to disclose Attorney Schrader-Cooke as a witness prior to trial was not sufficient to disqualify her from testifying about Estien's deal with the government.

As its final basis for prohibiting Attorney Schrader-Cooke from testifying, the trial court stated that allowing Attorney Schrader-Cooke to testify concerning any deal between Estien and the government would violate Estien and Attorney Schrader-Cooke's attorney-client

234

relationship. At the outset, we "acknowledge the importance of the attorney-client privilege, which is one of the oldest recognized privileges for confidential communications." *Mohawk Industries, Inc. v. Carpenter*, ___ U.S. ___, 130 S. Ct. 599, 606, 175 L. Ed. 2d 458 (2009) (internal quotation marks omitted). By assuring confidentiality, the privilege protects the attorney-client relationship and "encourages clients to make full and frank disclosures to their attorneys, who are then better able to provide candid advice and effective representation. This, in turn, serves broader public interests in the observance of law and administration of justice." *Id.* (internal citation and quotation marks omitted). The attorney-client privilege, however, is personal, belongs solely to the client, and generally cannot be asserted by anyone other than the client. *See United States v. Hatcher*, 323 F.3d 666, 674 n.2 (8th Cir. 2003) (citing *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986)); *In re Impounded Cases (Law Firm)*, 879 F.2d 1211, 1213 (3d Cir. 1989). Additionally, the burden of showing the existence of circumstances justifying the recognition of the attorney-client privilege rests with the party asserting the privilege, and "[b]ecause it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *See United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (internal quotation marks omitted); *see also Capitol Surgical Supplies, Inc. v. Casale*, 86 Fed. Appx. 506, 508 (3d Cir. 2004).

 In this case, the trial court prohibited Attorney Schrader-Cooke from testifying based on her attorney-client relationship with Estien, despite the fact that neither Estien nor Attorney Schrader-Cooke had asserted the attorney-client privilege.[20] Moreover, even if Estien or Attorney Schrader-Cooke had asserted the privilege, it is not clear whether Attorney Schrader-Cooke could have avoided testifying.[21]

---

[20] The attorney-client privilege may be asserted either by the client or the attorney, but the attorney's authority to assert the privilege, which is presumed in the absence of contrary evidence, is only on behalf of the client. *See Fisher v. United States*, 425 U.S. 391, 402, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976).

[21] The attorney-client privilege protects communications between attorneys and clients from compelled disclosure. In order for the attorney-client privilege to attach to a communication, "it must be '(1) a communication (2) made between privileged persons (3) *in confidence* (4) for the purpose of obtaining or providing legal assistance for the client.' " *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (emphasis added) (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000)). In this case, Attorney Schrader-

Several courts have recognized that an attorney may be required to testify about a communication regarding his client's plea agreement when the client puts that communication at issue. *See Chase v. Bowen*, 183 Vt. 187, 945 A.2d 901, 911 (Vt. 2008); *People v. Trujillo*, 144 P.3d 539, 543-45 (Colo. 2006); *St. Clair v. Commonwealth*, 140 S.W.3d 510, 548-49 (Ky. 2004); *Gomez-Zapata v. State*, No. 14-96-00400-CR, 1998 Tex. App. LEXIS 6632, at *11 n.3 (Tex. Ct. App. Oct. 22, 1998) (unpublished); *see also Arrington v. Williams*, 195 Fed. Appx. 761, 763 (10th Cir. 2006) (unpublished) (noting that witness's attorney was permitted to testify about a plea agreement between witness and the prosecution); *Hovey v. Ayers*, 458 F.3d 892, 919 (9th Cir. 2006) (same); *Blair v. Armontrout*, 916 F.2d 1310, 1317 n.6 (8th Cir. 1990) (same). However, we need not reach that issue today because even if the trial court erred in excluding Attorney Schrader-Cooke from testifying, its error was harmless beyond a reasonable doubt.[22] *See Hardwick*, 544 F.3d at 574.

 In applying harmless error review, we must determine whether an error affects substantial rights, and if there is no such effect, then the error will not constitute grounds for reversal. *See* V.I.S.CT.R. 4(i); *Blyden v. People*, 53 V.I. 637, 656-57 (V.I. 2010). Moreover, certain constitutional errors, including an improper denial of a defendant's opportunity to impeach a witness for bias, may be found to be harmless in terms of their effect on the factfinding process at trial "if the reviewing court may confidently say, on the whole record, that the constitutional

---

Cooke's proposed testimony concerned a communication made between the government, Estien, and herself.

[22] Despite our conclusion that any error the trial court may have committed by prohibiting Attorney Schrader-Cooke from testifying was harmless beyond a reasonable doubt, we find it troubling that neither the People nor the trial court took any action to correct Estien's testimony that he had no deal with the government. At a sidebar conference during Jeffrey's attorney's cross-examination of Estien, the People acknowledged that the government had made a "deal" with Estien under which it would consider recommending a sentence of probation for his gun possession charge if he testified at Jeffrey's trial. (J.A. Vol. VIII 24-25.) Immediately following this sidebar, however, Estien denied the existence of this deal. (J.A. Vol. VIII 27.) Moreover, he denied that he had made any deal with the government. The trial court should have taken the same initiative to protect Jeffrey's due process rights as it did to protect Estien's attorney-client privilege. *See Giglio v. United States*, 405 U.S. 150, 155, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (holding due process mandates that the jury be aware of "evidence of any understanding or agreement as to a future prosecution."); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (holding prosecutor's failure to correct testimony of witness which he knows to be false violates due process).

error was harmless beyond a reasonable doubt."[23] *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). "In determining whether an error in admitting testimony is harmless, several factors are considered including: 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " *Blyden*, 53 V.I. at 657 (quoting *Van Arsdall*, 475 U.S. at 684). "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Van Arsdall*, 475 U.S. at 681 (internal citation omitted).

Here, in addition to Estien's testimony, the People presented video surveillance from a casino in St. Croix showing Jeffrey and Melendez entering the casino together, and then leaving together less than an hour before the shooting. Marsela Jarvis, Martika Jarvis, and Nioka Shaw each testified that they had witnessed the shooting from their respective apartments in the housing community and indentified Jeffrey as the driver of the vehicle used to perpetrate the shooting. Marsela Jarvis further identified Jeffrey's silver Hyundai Brio as the car involved in the shooting.[24] This testimony was corroborated by multiple other witnesses to the shooting who also identified Jeffrey's car as the car used in the shooting. Finally, the VIPD discovered a spent 12 gauge shotgun shell behind the rear passenger headrest of Jeffrey's car that was similar to the spent 12 gauge shotgun shells found at the scene of the shooting. Based

---

[23] However, "some constitutional errors — such as denying a defendant the assistance of counsel at trial, or compelling him to stand trial before a trier of fact with a financial stake in the outcome — are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Van Arsdall*, 475 U.S. 681.

[24] Specifically, Marsela Jarvis testified Jeffrey was driving the silver Hyundai Brio, and that Melendez was riding in the front passenger seat. She further testified that Melendez fired four shots at a group of people who were in front of one of the housing community's apartment buildings as the car passed the apartment building, after which, Jeffrey turned the car around and as they passed by the group a second time Melendez — this time sitting in the window of the passenger seat with a long gun rested on the roof of the car — opened fire on the group again.

on this overwhelming evidence, any error the trial court made by failing to allow Jeffrey to present evidence that Estien had an incentive to testify against him was harmless beyond a reasonable doubt.[25]

## F. Change of Venue

 Jeffrey next contends that the trial court denied him of his constitutional right to a fair trial when it failed to grant his motion for a change of venue. (Appellant's Br. 23-25.) He asserts that the pretrial publicity surrounding his case was highly inflammatory and prejudiced the entire St. Croix community against him. In support of this assertion, Jeffrey points to eight newspaper articles from the *St. Croix Source* and *St. Croix Avis*, as well as a disruption that occurred during a release hearing related to Jeffrey's case.[26] (J.A. 347-60.) Based on these facts, Jeffrey claims that he was unable to receive a fair trial in St. Croix, and the Superior Court erred in not transferring his case to St. Thomas.

 This Court has previously recognized that the Virgin Islands Code "authorizes 'a judge of the Superior Court . . . with the approval of the presiding judge,' to 'transfer any action or proceeding pending in one judicial division to the other judicial division for hearing and determination' if such a change in venue is 'in the interest of justice.' " *In re People*, 51 V.I. 374, 391 (V.I. 2009) (quoting 4 V.I.C. § 78). The United States Supreme Court has held that "[t]he Sixth Amendment

---

[25] We come to this conclusion after carefully evaluating all of the evidence, including the fact that there were conflicting descriptions of the vehicle used in the shooting and several of the witnesses who indentified Jeffrey did not initially come forward.

[26] Jeffrey also points to a May 1, 2008 *Avis* article indicating that the family of one of the victims was upset at the Superior Court's initial decision to transfer Jeffrey's case to St. Thomas and the rumors and speculation surrounding the death of the trial judge presiding over the case to support his argument that the trial court erred in failing to grant his motion for a change of venue. (Appellant's Br. 24.) However, there is no indication from the record that these issues were ever presented to the trial court. Furthermore, Jeffrey has not included a copy of the *Avis* article in his Joint Appendix on appeal. Nor has he included anything relating to any speculation or rumors surrounding the trial judge's death that would prejudice Jeffrey's ability to receive a fair trial in St. Croix. In fact, it is not even clear from Jeffrey's brief what speculation or rumors connected Jeffrey's pending case and the trial judge's death. Accordingly, we will not consider this information in reviewing the trial court's decision to deny Jeffrey's change of venue motion. *See United States v. Moorhead*, 18 V.I. 431, 433 (D.V.I. 1981) (holding that a defendant who moves for a change of venue "has the burden of placing on the record material which will show a reasonable likelihood of prejudicial publicity precluding a fair trial.").

secures to criminal defendants the right to trial by an impartial jury," *Skilling v. United States*, 561 U.S. ___, 130 S. Ct. 2896, 2912-13, 177 L. Ed. 2d 619 (2010), and "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Intense pretrial publicity will only constitutionally require a change of venue, however, in cases where it creates "such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). A presumption of prejudice is warranted only in extreme cases. *Skilling*, 130 S. Ct. at 2915. Courts should thus presume prejudice only in situations where the "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process." *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992) (en banc), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). "[W]hen evaluating whether the pretrial publicity violated the defendant's right to an impartial jury, we are to consider the content, quantity, and timing of the publicity." *Hetzel v. Lamas*, 372 Fed. Appx. 280, 283 (3d Cir. 2010) (unpublished) (citing United States Supreme Court cases). We "may also look to the record of voir dire to examine the effect of the publicity on the venire." *Id.*

▮ Reviewing the eight newspaper articles included in Jeffrey's pretrial motion for a change of venue, we are not persuaded that there was a reasonable likelihood that pretrial publicity precluded him from receiving a fair trial. To begin, all of the articles relied on by Jeffrey were published between December 25, 2007 and March 7, 2008, which was approximately eighteen months before jury selection.[27] Of those eight articles, two do not even mention Jeffrey's name. (J.A. 347, 357.) Another focuses almost exclusively on one of the victims, and only briefly mentions that Jeffrey was arrested and charged with the shooting that caused his death. (J.A. 356.) The remaining five articles objectively report on Jeffrey and Melendez's arrest and subsequent advisement of rights,

---

[27] It should also be noted that four of the eight articles cited by Jeffrey were written within a week of the shooting.

arraignment, and bail proceedings. Each of the articles focuses on what occurred at the Superior Court proceeding and only provides enough background information concerning the shooting as is necessary to familiarize the reader with the basic facts. They disclosed that a shooting occurred at the housing community involved in this case in the early morning hours on Christmas day of 2007, and that two individuals died as a result of the shooting, while four others were injured. The articles further indicate that Jeffrey and Melendez had been arrested and charged for their alleged participation in the shooting. Nothing in these articles can be read as sensational, inflammatory, or slanted toward convictions. For example, the articles did not reveal whether Jeffrey has a prior criminal record or refer to any confessions, admissions, or other incriminating evidence implicating him in the shooting. Instead, the articles are factual and objective. Accordingly, we cannot conclude that these eight articles that were published more than eighteen months prior to jury selection are sufficient to establish that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.[28] *See Hetzel*, 372 Fed. Appx. at 284 (holding seventy-two articles — the majority of which were published over a year before jury selection — that were mostly factual, objectively reported, and did not contain incriminating evidence were not sufficient to establish a presumption of prejudice).

 Jeffrey also points to an incident that allegedly occurred at his December 31, 2007 advisement of rights hearing to support his contention that the pretrial publicity surrounding his case was highly inflammatory and prejudiced the entire St. Croix community against him. He claims that the trial court was required to empty the gallery of the courtroom on December 31, 2007 in response to the outrage of the public in attendance,

---

[28] The Superior Court's June 5, 2008 order ultimately denying Jeffrey's motion for change of venue indicated that if *voir dire* of the jury panel revealed the existence of a widespread prejudice that would deny Jeffrey a fair trial, the trial court could revisit the issue. There is no indication from the record, however, that Jeffrey ever challenged his ability to receive a fair trial during or after jury selection. Nor has Jeffrey argued on appeal that the pretrial publicity actually prejudiced him — i.e. 1) that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty, and 2) that these jurors could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court. *See United States v. Langford*, 647 F.3d 1309, 1332 (11th Cir. 2011).

which interrupted the proceedings on several occasions. However, Jeffrey has failed to direct this Court to any part of the record that specifically addresses the facts surrounding the December 31, 2007 advisement of rights hearing and how it showed that he could not receive a fair trial in St. Croix. In fact, the only mention of the December 31, 2007 courtroom disruption is found in the trial court's June 5, 2008 order denying Jeffrey's motion for change of venue. In that order, the trial court noted:

> The Court remains mindful of a disruption which occurred at an earlier stage of this case when a release hearing was closed to the public. Subsequent hearings have passed without incident so that, while any subsequent disruptions may cause the Court to revisit the issue of transfer, at this stage the Court cannot say with certainty that any further such disruptions will occur.

(J.A. 219) We cannot conclude that the actions of an unspecified amount of people at a pretrial proceeding on December 31, 2007 is sufficient to show that there was a reasonable likelihood that Jeffrey was precluded from receiving a fair trial in September 2009. Therefore, we conclude that the trial court did not err in denying Jeffrey's motion for a change of venue.

### G. Juror Misconduct

As Jeffrey's final argument on appeal, he contends that two jurors failed to fully disclose certain facts during the jury selection process, which prevented him from selecting a fair and impartial jury. (Appellant's Br. 26.) Jeffrey first claims that juror number 148 indicated on the jury questionnaire that she was related by blood or marriage to a person in law enforcement, but failed to identify what relationship she had with this person. He also claims that juror number 137 failed to disclose that her brother is an officer with the VIPD, that her niece works at the Superior Court as a marshal, and that her sister is a corrections officer with the Bureau of Corrections. Jeffrey thus claims that the failure of these jurors to disclose this information during *voir dire* prevented him from "properly assessing the use of [his] peremptory challenges and from eliciting challenges for cause from the [trial court]." (Appellant's Br. 27.) This argument, however, ignores the facts in the record.

To receive a new trial because a prospective juror failed to answer a *voir dire* question appropriately, the defendant "must first demonstrate

241

that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984); *United States v. Hodge*, 321 F.3d 429, 441 (3d Cir. 2003). *See Dowdye v. People*, 55 V.I. 736, 759 (V.I. 2011). Moreover, while motives for concealing information may vary, "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.

■ Here, Jeffrey has failed to demonstrate that either juror number 137 or juror number 148 failed to answer honestly a material question during *voir dire*. In completing the jury questionnaire, juror number 137 and juror number 148 both indicated that they were related by blood or marriage to a person in law enforcement, but left blank the section of that question that asked "how is that person(s) related to you." (J.A. 228-29.) Additionally, juror number 137 indicated that she was related by blood or marriage to a person who had worked for one of the Virgin Islands courts or agencies involved with criminal prosecutions, but left blank the section of that question that asked "how is that person(s) related to you." (J.A. 229.) During *voir dire*, however, the trial court asked the jury panel: "Is there anyone on this panel who has a family member or close friend who is currently employed, previously employed with the Department of Justice, Office of the United States Attorney or any other agency involved with criminal prosecution and law enforcement?" (J.A. Vol. I 90.) In response, juror number 137 informed the court and the parties that she had a brother that is a police officer, a niece that is a marshal, and a sister that is a corrections officer. (J.A. Vol. I 101.) Juror number 148 also informed the court and the parties that her brother-in-law is a lieutenant in the police department.[29] (J.A. Vol. I 104.) Jeffrey failed to inquire further regarding these relationships, despite being given the opportunity by the trial court. (J.A. Vol. II 198-99, 231.) Thus, Jeffrey's argument that juror number 137 and juror number 148 failed to fully disclose material facts

---

[29] Both jurors further indicated that their family members' employment would not have an effect on how they viewed the evidence; that they could put aside their family members' employment and be fair and impartial to both sides in rendering a verdict; and that they could render a verdict based solely on the evidence presented during trial. (J.A. Vol. I 101-04.)

during the jury selection process is directly contradicted by the record, and the trial court did not err in rejecting this argument.

## III. CONCLUSION

Even if the VIPD illegally seized Jeffrey's vehicle, the trial court did not err in admitting the evidence discovered from a subsequent search of the vehicle because the search was conducted pursuant to a properly issued warrant and supported by probable cause acquired independently of the illegal impoundment. The trial court did err by failing to instruct the jury that Marcella's statement could not be used as evidence against Jeffrey, by allowing Burke and McIntosh's death certificates to be introduced into evidence, and by excluding Attorney Schrader-Cooke from testifying. However, we are convinced beyond a reasonable doubt that these errors were harmless. Jeffrey has also failed to demonstrate that there was a reasonable likelihood that pretrial publicity precluded him from receiving a fair trial in St. Croix or that either juror number 137 or juror number 148 failed to answer honestly a material question during *voir dire*. Therefore, we affirm the judgment of the Superior Court.